UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Crim. No. 3:16cr229(RNC) |
| | : | |
| v. | : | VIOLATIONS: |
| | : | |
| YU LONG | : | 18 U.S.C. §§ 1831(a)(2) and (a)(5) |
| | : | (conspiracy to engage in economic |
| | : | espionage) |
| | : | |
| | : | 22 U.S.C. §§ 2778(b)(2) and 2778(c) (export |
| | : | and attempted export of defense articles to |
| | : | China without a license) |

FILED
2016 DEC 19 PM 6 04
U.S. DISTRICT COURT
NEW HAVEN, CT.

INFORMATION

The United States Attorney charges that at all times relevant to this Information:

General Allegations

1. The defendant YU LONG was a citizen of the People's Republic of China (PRC or China). In 2010, LONG became a lawful permanent resident of the United States.

2. United Technologies Corporation (UTC) was a publicly traded corporation that researched, developed, and manufactured high technology products, including aircraft engines, HVAC equipment, elevators and escalators, fire and security equipment, and building systems. UTC and its subsidiaries were also large defense contractors that designed and manufactured, among other things, aircraft, aircraft engines, and aerospace equipment.

3. United Technologies Research Center (UTRC) performed research and development for, and delivered advanced technology to, the business units of UTC, including UTC Aerospace Systems; Pratt & Whitney; UTC Climate, Controls & Security; and Otis (all UTC-related entities are hereinafter collectively referred to as "the Company").

4. The Company's technology included, but was not limited to, the following trade secrets related to the manufacture of engine components:

    a. Trade Secret One: data regarding manufacturing methods contained within an electronic document entitled "Additive_Mfg_SEV_Mar2010.pdf".

    b. Trade Secret Two: information regarding distortion modeling contained within an electronic document entitled "distortion_modeling_3rd_review_20110930Final.pdf".

    c. Trade Secret Three: information regarding distortion modeling contained within an electronic document entitled "distortion_modeling_FINAL_review_2011-11-22.pdf".

    d. Trade Secret Four: a Company presentation regarding distortion modeling contained with an electronic document with filename "PW_PI_2011.rar".

5. The Company sought to prevent unauthorized use or disclosure of its proprietary information and trade secrets through a variety of measures including, but not limited to: requiring employees to execute non-disclosure agreements; training employees on the protection and confidentiality of sensitive, proprietary, trade secret, and export controlled material; and requiring separating employees to certify that they had returned all confidential or secret Company materials.

6. From approximately May 2008 through May 2014, LONG was employed by UTRC in Connecticut as a Senior Engineer/Scientist in the Materials Science Group. When LONG began his employment with the Company in 2008, and again at or around the time that his employment terminated with the Company in 2014, LONG signed documents regarding intellectual property and proprietary information acquired during the course of his employment. For example, in an "Intellectual Property Agreement" that LONG signed as a new hire on May 27, 2008, LONG agreed:

> I will not, either during or after my employment, use, publish or otherwise disclose, except for [the Company's] benefit in the course of such employment, any technical

2

or business information developed by, for or at the expense of [the Company], or assigned or entrusted to [the Company] by me or anyone else, unless such information is generally known outside of [the Company], and I will deliver to or leave with [the Company] all written and other materials containing such information upon termination of my employment.

I agree that all trade secrets, all inventions, all works of authorship (including illustrations, writings . . . software and computer programs), and all other business or technical information created or conceived by me, either alone or with others, while employed by [the Company] and related to the existing contemplated business or research of [the Company] or resulting from my work with [the Company], belong to [the Company] . . .

7. While employed at the Company, LONG also took courses, both in-person and online, regarding the protection and confidentiality of sensitive, proprietary, trade secret, and export controlled material, including technical data; licensing requirements for the transfer, transmission, or disclosure of such materials to foreign persons; restrictions on the export or attempted export of such materials outside the United States; export control markings; the International Traffic in Arms Regulations (ITAR); and the United States Munitions List (USML). Such trainings also specifically covered the export laws, regulations, and documentation required for traveling outside the United States with export controlled data on a computer, laptop, or other digital media.

8. While employed at the Company, LONG also executed the Company Export Control Personal Responsibility acknowledgments, in which he agreed, among other things, that in the event he accessed "export controlled technology or software (electronically or physically), I agree not to transfer any such technology or software to another foreign person in any manner or form regardless of location…"

9. Beginning in 2013, while still employed at the Company, LONG expressed his intent to individuals outside the Company to return to China to seek employment at state-run universities in China using knowledge and material he had acquired while employed at the

Company. To that end, LONG contacted the Chinese Academy of Science (CAS). CAS is a ministry under the State Council of the People's Republic of China, which is the highest executive arm of state power and state administration in China. CAS offers a variety of highly competitive "Talent Plans," which are PRC government-run programs designed to recruit talent and obtain information and technology from abroad in order to benefit and modernize China's industry, economy, and national security.

10.     During the summer of 2013, LONG contacted various state-run universities in China, to inquire about employment opportunities. For example, on or about July 30, 2013, LONG emailed his resume to the Guangzhou Institute of Advanced Technology (GIAT) and the Shenyang Institute of Automation (SIA), which are state-run universities in China affiliated with CAS, and asked if he was qualified for certain talent plans. On or about August 1, 2013, SIA responded to LONG, stating "You are the talent we need."

COUNT ONE
(Conspiracy to engage in economic espionage)

11.     The allegations contained in paragraphs 1 through 10 of this Information are hereby re-alleged and incorporated as if fully set forth herein.

12.     From approximately January 2013 through approximately November 2014, the exact dates being unknown, in the District of Connecticut and elsewhere, LONG, together with others known and unknown, did knowingly agree and conspire to transmit, deliver, communicate, and convey trade secrets without authorization knowing that the offense would benefit a foreign government, namely, the PRC, a foreign instrumentality, or a foreign agent, in violation of 18 U.S.C. § 1831(a)(2).

## Manner and Means of the Conspiracy

13. It was a part and an object of the conspiracy that LONG would knowingly and without authorization take and carry away the Company's trade secrets.

14. It was further part of the conspiracy that LONG would travel to the PRC and take with him the Company's trade secrets.

15. It was further part of the conspiracy that LONG would communicate and convey the Company's trade secrets knowing that doing so would benefit the PRC.

## Overt Acts

16. In furtherance of the agreement and to effect its objects, LONG and others known and unknown committed the following overt acts, among others, in the District of Connecticut and elsewhere:

17. On or about August 24, 2013, LONG emailed an employment application to GZSIA. In the email, LONG explained, "In the past five years, I have been working with Pratt Whitney, also other UTC business units, like UTAS (including Hamilton Sundstrand and Goodrich), Sikorsky, CCS (including Carrier and Fire & Security), and Otis. These unique working experiences have provided me a great starting point to perform R&D and further spin off business in China. I believe my efforts will help China to mature its own aircraft engines."

18. Between November 23, 2013, and December 1, 2013, LONG traveled to China to interview at SIA.

19. On November 29, 2013, a recruiter from SIA emailed LONG to inform him that he had successfully passed his interview for the "Hundred Talent Plan A."

20. On December 19, 2013, the SIA Director offered LONG a position at SIA.

21. Between December 21 and 23, 2013, the Director of SIA discussed financial incentives and benefits with LONG, and directed LONG to provide samples of the work he completed at the Company to substantiate the claims LONG made in his job application and subsequent interview with SIA. LONG agreed to provide the requested information.

22. On December 24, 2013, LONG emailed several documents to the Director of SIA, including information about LONG's claim to hold certain patents. LONG also sent the Director a document with the filename "PW_PI_2011.rar," which contained the cover page of a September 30, 2011, Company presentation entitled "F135 9th Stage Distortion Modeling, 3rd Review." The cover page included the following markings: "United Technologies Research Center," "UTC Confidential," and in red letters "ITAR controlled."

23. On or about May 17, 2014, LONG emailed the SIA Recruiter to confirm that he would be joining SIA at the end of May and to ask what documentation he should bring.

24. On June 10, 2014, LONG traveled from New York to China. LONG left the United States with an Apricorn Padlock external hard drive that had been issued to him by the Company, and which he unlawfully retained when he left the Company. The material on the hard drive included the files containing Trade Secrets One through Four, as well as several other Company documents, data, and source codes relating to highly sensitive, proprietary, trade secret, and export controlled material.

25. On August 12, 2014, while in China, LONG accessed an electronic file on the external hard drive entitled "distortion_modeling_3rd_review_20110930Final.pdf". The first page of the file was identical to the document that LONG emailed to the Director of SIA on December 24, 2013.

26. On August 19, 2014, LONG returned to the United States. On August 20, 2014, LONG emailed a Talent Professor at Tsinghua University in China attaching an updated "achievement and future plan." In the plan LONG stated that he had knowledge of unpublished Company projects in which the United States Air Force had shown interest. LONG also discussed his work on the F119 and F135 U.S. military fighter jet engines, both of which are manufactured by Pratt & Whitney, a division of the Company.

27. On November 5, 2014, LONG flew from Ithaca, New York, to Newark Liberty International Airport in Newark, New Jersey, where he planned to board an international flight to China. LONG had export-controlled and proprietary information that belonged to the Company, including the above-described hard drive containing Trade Secrets One through Four, in his possession during his attempted travel to China.

All in violation of 18 U.S.C. §§ 1831(a)(2) and (a)(5).

## COUNT TWO
(Export and attempted export of defense articles to China without a license)

28. The allegations set forth in paragraphs 1 through 10 and 17 through 27 of this Information are hereby re-alleged and incorporated as if fully set forth herein.

### The Arms Export Control Act and International Traffic in Arms Regulations

29. The Arms Export Control Act (AECA), 22 U.S.C. §§ 2751-2799, prohibits the export of defense materials without first obtaining a license from the Department of State. Section 38 of the AECA, 22 U.S.C. § 2778, regulates the export from and import into the United States of "defense articles" and "defense services." The State Department, Directorate of Defense Trade Controls (DDTC), promulgates regulations under the AECA that are known as the International Traffic in Arms Regulations (ITAR). 22 C.F.R. §§ 120-130. The ITAR contain the United States

Munitions List (USML), which sets forth 21 categories of defense articles and services that are subject to export licensing controls. *Id.* § 121.1.

30. Unless an exemption applies, the ITAR requires an export license from DDTC for the export of USML articles and related technical data to all destinations. *See* 22 C.F.R. §§ 123, 124 and 125. A license application must describe the munitions sought to be exported with particularity, as well as set forth the ultimate consignee and end use.

31. In addition, and as set forth in ITAR § 126.1 "[i]t is the policy of the United States to deny licenses and other approvals for exports and imports of defense articles and defense services, destined for or originating in certain countries." *See* 22 C.F.R. § 126.1(a). Among other countries, this policy applies to China. *See id.* Accordingly, "[n]o sale, export, transfer, reexport, or retransfer of, and no proposal or presentation to sell, export, transfer, reexport, or retransfer, any defense articles or defense services . . . may be made to [China] . . . or to any person acting on its behalf, whether in the United States or abroad, without first obtaining a license or written approval of the Directorate of Defense Trade Controls. However…it is the policy of the Department of State to deny licenses and approvals in such cases." *See* ITAR § 126.1(e)(1).

32. Without first obtaining the required license or other written approval from the DDTC, it is unlawful to willfully export or attempt to export from the United States any defense article or technical data or to furnish or attempt to furnish any defense service for which a license or written approval is required. *See* ITAR § 127.1(a).

33. From approximately May 2014 through November 2014, in the District of Connecticut and elsewhere, LONG knowingly and willfully exported and attempted to export from the United States to China documents containing technical data, namely, the items described in paragraphs 4a through 4c of this Information, that are designated as defense articles under

Category XIX(g) on the USML, without having first obtained from the Department of State a license for such export or written authorization for such export.

All in violation of 22 U.S.C. §§ 2778(b)(2) and 2778(c), and 22 C.F.R. §§ 121.1, 126.1(a) and (e), 127.1(a), and 127.3.

## FORFEITURE ALLEGATION

34. Upon conviction of the offenses alleged in Counts One and Two of this Information, the defendant YU LONG shall forfeit to the United States of America pursuant to 18 U.S.C. §§ 1834 and 2323, 22 U.S.C. § 401, and 28 U.S.C. § 2461(c), all right, title, and interest in any and all items and information transmitted, delivered, communicated, conveyed, exported, and attempted to be exported in violation of law, including (1) all of the documents and information obtained from the Company and through his employment at the Company and (2) all of the digital media identified below.

| Type | Make | Serial/Bar Code Number |
|---|---|---|
| USB 3.0 Padlock 3 | Apricorn | A25-3PL256-XXXX |
| External Hard Drive | Western Digital | WXG1A91K4501 |
| Thinkpad | Lenovo T61 | L3 D3098 07/10 |

All in accordance with 22 U.S.C. § 401, 28 U.S.C. § 2461(c), and 21 U.S.C. § 853, and Rule 32.2(a), Federal Rules of Criminal Procedure.

UNITED STATES OF AMERICA

DEIRDRE M. DALY
UNITED STATES ATTORNEY

TRACY LEE DAYTON
ASSISTANT UNITED STATES ATTORNEY